NELSON P. COHEN
United States Attorney

DANIEL R. COOPER, JR.
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
(907) 271-5071
(907) 271-2344 - Fax
daniel.cooper@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MICHAEL SHELDON, as personal representative of the Estate of Donna Marie (Hart) Sheldon, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case 3:05-cv-00119-RRB<br><br>UNITED STATES' OPPOSITION TO MOTION FOR IN CAMERA REVIEW OF DOCUMENTS |

The United States, through counsel, enters its Opposition to Plaintiff's

Motion For *In Camera* Inspection of Documents [Docket 26]. This opposition is

based upon the fact that the documents originally sought by plaintiff, documents

CLM 67 - 71 and CLM 73 - 81[1] are protected from discovery by the work product rule, Rule 26(b)(3), F.R.Civ.P.  Further, the documents identified in the Stipulation (the Mortality and Morbidity Conference minutes) are protected by the critical self-analysis privilege, and should not be disclosed.

## FACTUAL BACKGROUND

Donna Marie (Hart) Sheldon died October 16, 1997.  On or about October 22, 1999, Plaintiff filed an administrative tort claim with the Department of Health and Social Services, alleging that the medical staff at Alaska Native Medical Center ("ANMC") failed to properly monitor the decedent during surgery for the possibility of developing aspiration pneumonia, and failed to timely diagnose and treat her condition.  Plaintiff claims that his wife died as a result of this negligence.

Shortly after Mrs. Sheldon's death, on October 17, 1997, the Alaska Native Medical Center and Hospital ("ANMCH") held a Mortality and Morbidity Conference, also referred to as a Root Cause Analysis conference (RCA).  The transcript of that meeting and the RCA flow sheet have been identified as documents SCF000098 - 127.

---

[1] Documents CLM  66 - 71 and CLM 73 - 81 are hereafter referred to as the IHS documents.

As is the normal case, upon receipt of the claim in 1999, the claim was assigned to a Senior Paralegal.[2] Working under the direction of the attorneys in the claims office, the paralegal obtained the hospital records and forwarded them to two Indian Health Service health care providers for the purpose of obtaining their medical opinions concerning the validity of the claim; that is, whether the standard of care was met in this case.[3] The Indian Health Service providers documented their medical opinions in reports, and it is these reports that Plaintiff now seeks.

In the initial review by undersigned counsel, the IHS documents were erroneously classified as attorney client privileged documents. Upon the written request for the documents, the IHS documents were once again reviewed to determine whether they fell within the attorney client privilege or the work product rule. Counsel inquired further of the claims office, and determined that the IHS documents were prepared by reviewers at the request of a claims officer. Thus, the IHS documents are documents prepared in anticipation of litigation by the party, and within the work product rule. Based upon that conclusion, counsel

---

[2] Declaration of Richard G. Bergeron, Exhibit A.

[3] Exhibit A, ¶ 8.

declined to produce the documents.

## THE WORK PRODUCT RULE

The so-called "work product rule" was first announced in <u>Hickman v. Taylor</u>, 67 S. Ct. 385 (1947) where the Court stated:

> Examination into a person's files and records, including those resulting from the professional activities of an attorney, must be judged with care. It is not without reason that various safeguards have been established to preclude unwarranted excursions into the privacy of a man's work. At the same time, public policy supports reasonable and necessary inquiries. Properly to balance these competing interests is a delicate and difficult task.[4]

The work product rule or doctrine has evolved since 1947. The work product doctrine now provides qualified immunity from the disclosure of documents and material made in preparation of litigation as established by Fed. R. Civ. P. 26(b)(3), which provides in part:

> *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

---

[4] <u>Id</u>. at 387.

The work product doctrine is not a privilege, but rather a qualified immunity. The doctrine protects documents and intangible things prepared by a party or his representative in anticipation of litigation from production.[5] The qualified immunity may be overcome and the documents ordered produced where the adverse party demonstrates both a substantial need for the preparation of their case, and that to obtain the same information would be impossible or would visit an undue hardship on them.[6]

Here, the materials were prepared at the request of the Defendant in anticipation of litigation. The claim had been filed, and the Office of General Counsel, through its paralegal assistants, sought opinions on the validity of the claim. If the claim was denied based on the report, then litigation would necessarily follow. Thus, the documents were prepared by a representative of the party, the United States, in anticipation of litigation.

In essence, these reports are the reports of consulting physicians, if not experts. The purpose of the reports is to evaluate the claim. Presumably, the Plaintiff hired a similar expert prior to filing this action to establish the applicable

---

[5] Admiral Insurance Company v. U.S. District Court for the District of Arizona, 881 F.2d 1486, 1494 (9th Cir. 1988).

[6] Id.

standard of care and to demonstrate that the standard of care was breached.[7] Thus, the Plaintiff has substantially the same or similar information available to him, and indeed it should already be in his possession. Moreover, it can not be argued that it would place an undue hardship on him to obtain this type of information, because Mr. Sheldon and his lawyer must have had this information before filing this claim in order to meet the requirements of Rule 11(b)(3), F.R.Civ.P. and AS 09.55.540(a).[8] As the court noted in cases cited in Admiral Insurance Co., supra, the principal function of the work product rule is to force each side to do its own

---

[7] A plaintiff in a malpractice action in the State of Alaska normally must offer medical expert opinions and testimony in order to support her claims and prove the elements under AS 09.55.540(a). If a plaintiff is unable to offer expert testimony to prove these required elements, summary judgment may be entered in favor of the defendant. Parker v. Tomera, 89 P.3d 761, 766 (Alaska 2004); Kendall v. State Div. of Corrections, 692 P.2d 953, 955 (Alaska 1984).

[8] The Alaska law governing medical malpractice actions places the burden of proof on the Plaintiff to prove by a preponderance of the evidence:
> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
> (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

work, and to prevent exploitation of the other's work.[9]

Mr. Sheldon argues, and his lawyer submits testimonial evidence, that no lawyer was involved, as far as they knew, at the time the claim was submitted. As Mr. Bergeron's declaration establishes, that is not the case.[10] Moreover, the work product rule is not limited to work performed directly by the attorneys or those working under their direction, but specifically includes the party themself. Indeed, the language of the rule is "...by or for another *party* or for that other party's representative...". The rule itself identifies the *party* as the primary entity to be protected. That is precisely what happened here.

These records must be protected under Rule 26(b)(3) because they were prepared by the party in anticipation of litigation. Mr. Sheldon has not met his burden that the documents contain information that is not already available to him, or is information that he could obtain only with undue hardship. In fact, as a matter of law, Mr. Sheldon is required to have that same information to prove his case, and he should have had it prior to commencing this lawsuit.

---

[9] Admiral Insurance Co., 881 F.2d at 1494.

[10] Exhibit A, ¶ 4. The paralegal assistants work under the direction of two attorneys.

## THE CRITICAL SELF-ANALYSIS PRIVILEGE

The "self-critical analysis" or "critical self-analysis" privilege was recognized by the Ninth Circuit in <u>Dowling v. American Hawaii Cruises, Inc.</u>,[11] although the court declined to apply it based on the facts of that case. In <u>Dowling</u>, the court established a four part test for judging when such a privilege would be applied: 1) the information must be self-critical analysis undertaken by the party seeking the protection, 2) the public must have a strong interest in maintaining the flow of the information, 3) the information must be of a type whose flow would be curtailed if discovery were allowed, and 4) the information must have been created with the expectation that it would be kept confidential, and it has in fact been kept confidential.[12]

As set forth in the affidavit of Dr. Neil Murphy, attached hereto as Exhibit B, each element of this privilege has been met with respect to the documents at issue. The documents at SCF 000098 - 127 were part of a critical self-analysis undertaken by the medical and risk management staff at ANMCH[13] (the

---

[11] 971 F.2d 423 (9th Cir.1992).

[12] <u>Dowling</u>, 971 F.2d at 425-26.

[13] The ANMCH is a non-profit, managed health care organization in Anchorage, Alaska that is jointly operated by the Alaska Native Tribal Health Consortium ("ANTHC") and the Southcentral Foundation ("SCF"). The ANTHC

documents memorialized the meeting at which the self analysis occurred), the public has a strong interest in seeing that critical self analysis and peer review occur in the provision of medical services so that errors will be corrected and future mistakes avoided, the information is of a type that may be curtailed if it is not kept confidential in that health care providers will be reluctant to be candid, and the information was created with the expectation that it would be kept private and it has been kept private.

     First, it is not disputed that the information was produced by and at ANMCH. According to the records, the attendees were Dr. Eklund, Dr. Harvey, Dr. Freudenthal, Dr. Murphy and Dr. Sapin, as well as Denise Morris and Zoe Quirk. At the time, all were employees or agents of ANMCH. Of these individuals, Mr. Sheldon has taken the depositions of Doctors Eklund, Murphy and Freudenthal. Dr. Harvey's deposition is scheduled for March 14, 2007. Any information possessed by these percipient witnesses was and has been available to Mr. Sheldon through deposition. The United States does not seek to hide anything

---

is a non-profit health organization owned and operated by Alaska Native tribal governments and their regional health organizations. The SCF is an Alaska Native-owned healthcare organization serving Alaska Natives and American Indians residing in the Anchorage Service Unit. At the time of the events giving rise to this complaint, however, ANMC was an IHS facility.

here: the United States seeks only to protect the production of this particular document, and to protect the process that lead to the creation of the document.

Second, the public assuredly has a strong interest in maintaining the flow of information of this type. It is only through open and candid discussion of an event that mistakes and errors, if any there be, can be identified and corrected. Indeed, the Congress of the United States identified the problem when it made the following findings:

> (1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.
> (3) This nationwide problem can be remedied through effective peer review.
> (5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.[14]

As Congress noted, there is an overriding need for not only physicians to engage in an effective (i.e., open and candid) professional peer review, but that the need extends to providing them protection in doing so. In consideration of this need, both ANMC and its accrediting body, the Joint Commission for the Accreditation of Healthcare Organizations (JCAHO), have adopted policies and procedures

---

[14] 42 U.S.C. § 11101 (1), (3), and (5).

describing what must occur in the case of a "sentinel event."[15] Indeed, ANMCH's policy is a result of the requirement imposed by JCAHO.[16] Moreover, the participants recognize this need as well.[17]

Third, the information must be of a type whose flow would be curtailed if discovery were allowed. As noted above, both hospital policy and the Joint Commission require such conferences, albeit by the name of Root Cause Analysis.[18] Thus, it may be fairly argued that the information can not be "curtailed" if the conferences are required. However, as Dr. Murphy's affidavit demonstrates, participants will be less willing to speak freely if they know that what they say can be used later to find fault with what they said or did either in treatment or at the conference.[19] Thus, absent protection, the information gleaned at the compelled meeting may, indeed, be curtailed. That is, it may be less frank,

---

[15] Exhibit C is the policy of ANMC. Exhibit D is the policy statement and requirement of JCAHO. Sentinel events are described the same in both policies, and include an event that results in the unanticipated death of a patient not related to the natural course of the patient's illness or underlying condition. See, Exhibit C, ¶ 3.1.1; Exhibit D, ¶ I.

[16] Exhibit B, ¶ 4.

[17] Exhibit B, ¶¶ 4, 5, 7, 8.

[18] Exhibits C and D.

[19] Exhibit B, ¶¶ 6, 7.

less wide ranging, and conversely, more guarded and circumspect. This latter event is exactly what Congress, the hospital, the JCAHO and the public is trying to avoid. On the one hand, Health care providers are told they must participate in self critical analysis for the public health and good, and then they are not protected for doing so. To deny protection is to deny human nature: those who are threatened by mandatory participation but without protection will not participate fully.

Finally, the information must have been created with the expectation that it would be kept confidential, and it has in fact been kept confidential. Such is the case here. As Exhibit D points out, all of the information provided to JCAHO must be kept confidential, and the caregivers themselves are not identified.[20] It is an essential element of the process that the participants are allowed to speak freely, and they only do so because they believe that the proceedings will be kept confidential.[21] ANMC has demonstrated its compliance with this last element of the privilege as well.

Based on the foregoing, the United States submits that it has met all of the

---

[20] Exhibit D, p. 10.

[21] Exhibit B, ¶¶ 6, 7.

elements of the critical self-analysis privilege.  Further, the United States submits that the court should find that the requirements of the privilege have been met, and deny the request for production.

The request of the United States in the preceding paragraph is made with the recognition that the critical self analysis privilege has not been fully adopted in this Circuit.[22]  This privilege has been, however, adopted in other jurisdictions in the context of medical malpractice cases.[23]  The issue of such a privilege is a matter of considerable debate and divergent conclusions.  The matter has not been fully decided in the Ninth Circuit.

In Agster v. Maricopa County, 422 F.3d 836 (9th Cir. 2005), the plaintiff sought the production of the mortality review of his decedent at the county jail.  There, as here, the jail employees were required to perform such a review and analysis.  The analysis was intended to be kept confidential and was kept confidential.  The defendants requested the court apply either the State of Arizona's peer review privilege statute, or to adopt a new federal peer review

---

[22] Dowling v. American Hawaii Cruises, 971 F.2d 423, 425 (9th Cir. 1992); Union Pacific R. C. v. Mower, 219 F.3d 1069, 1076 n. 7 (9th Cir. 2000) (citing Dowling, at 425 - 426).

[23] See, e.g., Weekoty v. Spectrum Medical Group, 30 F. Supp. 2d 1343 (D.C.N.M. 1998)

privilege, and refuse to order production of the documents. The District court declined to do so, ordered the documents produced, and defendants appealed.

The circuit court declined to apply the Arizona State statutory peer review privilege in the federal case before it. However, the court readily observed that it could create a new privilege based on federal common law.[24] The court then declined to adopt a federal peer review privilege for two reasons: First, the court held that it was reluctant to adopt such a peer review privilege when Congress had twice previously had the opportunity to enact legislation on the issue but failed to do so. Second, the court declined to adopt this privilege in the context of a death in a county jail, or "prison." The court stated:

> The particular objection is that the privilege is sought to protect a report bearing on the death of a prisoner. Whereas in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. In these circumstances, it is peculiarly important that the public have access to the assessment by peers of the care provided. Given the demands for public accountability, which seem likely to guarantee that such reviews take place whether they are privileged or not, we are not convinced by the County's argument that such

---

[24] Agster v. Maricopa County, 422 F.3d at 839. " A "public good transcending the normally predominant principle" disfavoring testimonial privileges may justify such creation. Jaffee v. Redmond, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (internal quotations and citation omitted). The law of privilege is not frozen. The process of recognizing one is "evolutionary." Id. (citation omitted)."

> reviews will cease unless kept confidential by a federal peer review privilege. Accordingly, we are unwilling to create the privilege in this case.[25]

The court was correct in its view that distinguish county jails from hospitals: in the ordinary hospital, the first object of all involved in patient care is the welfare of the patient. Such is the case here as established by the Dr. Murphy's affidavit. The health care providers and ANMCH all want to improve health care for all patients. That is one of the reasons they hold such conferences as a matter of policy. The parties want to learn from their mistakes and correct their systems and procedures to safeguard the patients. The facts are distinguishable from a mortality analysis done on the conduct of guards in a prison or county jail where the major issue is the precipitating event or injury that lead to the need for medical care in the first instance. Such a review implicates violations of the prisoner's civil rights, an issue not present here.

    The correct analysis here is whether health care practitioners in the District of Alaska are to be encouraged to meet and speak freely about events so as to correct systems and processes and assure the safety of patients. It is improper to apply the analysis of protecting physicians in a peer review process where the

---

[25] Id.

underlying claim is one of anti-competitive conduct, or where the civil rights of an individual have been implicated. The analysis that must be applied in this case is the furtherance of good medical practice and procedures to prevent future patient harm. That analysis should take place in the context of keeping the minutes of the meeting confidential, not to hide the information, but to encourage the free flow of ideas.

Moreover, the analysis must also consider that the plaintiff is not barred from obtaining the same or similar information, and still may inquire from all of the health care providers about their thoughts and processes concerning the treatment of the patient. This privilege is very different in this respect from the attorney client privilege where the communications themselves are confidential, in whatever form they may be, and are lost to the opposing party in the absence of waiver or exception. In the case before the court, the United States is requesting only that the critical self-analysis privilege be applied to one document, a specific document, and nothing else.

This court should recognize and apply the critical self-analysis privilege first identified by the Ninth Circuit in <u>Dowling</u> to the facts of this specific case. To compel the production of the minutes of the Mortality and Morbidity

Conference/Root Cause Analysis, will greatly chill participation in such events in the future. The compulsion of production of this document will also have an adverse effect on the future health care and patient safety of others as physicians and other health care providers become more reluctant to participate in a free and open manner. In balancing the needs of this plaintiff, who can readily obtain similar information elsewhere, against the need to assure future quality health care, the balance should be struck on behalf of future quality health care.

      RESPECTFULLY SUBMITTED on March 5, 2007.

NELSON P. COHEN
United States Attorney

s/ Daniel R. Cooper, Jr.
Assistant U. S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3376
Fax: (907) 271-2344
E-mail: Daniel.Cooper@usdoj.gov
AK #8211109

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2007,
a copy of the foregoing Opposition to Motion
for In Camera Review of Documents was served
electronically on John S. Hedland.

s/ Daniel R. Cooper, Jr.