IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MICHAEL SHELDON, as personal representative of the estate of Donna Marie (Hart) Sheldon, deceased,<br><br>                  Plaintiff,<br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>                  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. A05–119 CV [RRB] |

**REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR *IN CAMERA* INSPECTION OF DOCUMETNS**

    1.      Background.

The government initially claimed a privilege under A.S. 18.23.030 for certain documents that it characterized as "peer review" documents. When plaintiff sought production of these documents on the grounds that the Alaska peer review privilege statute did not apply, and that there was no comparable federal privilege, the government asserted that the documents were privileged as attorney work product or as attorney-client communications. After the filing of plaintiff's submission in support of *in camera* inspection of these documents to determine whether or not any legitimate claim of privilege applied, the government responded, abandoning any contention that they were privileged attorney-client communications, but still asserting that they constituted attorney work product. These documents are referred to in the government's memorandum as "the IHS documents" and apparently consist of opinion letters obtained by the Claims Branch at the request of a paralegal in connection with the administrative

claim filed by plaintiff in this case. These documents were prepared on or about April 26, 2000, according to the government.

While the instant motion practice was pending, plaintiff was apprised of a second set of documents generated in October, 1997 shortly after the death of Ms. Sheldon. The government concedes that these documents were generated before the involvement of an attorney, and they appear to be garden variety peer review materials (Mortality and Morbidity Conference minutes). The government does not assert work product or attorney-client privilege as to these documents, but claims that they are protected by the "critical self-analysis privilege". The government agrees that this privilege has never been adopted by the Ninth Circuit, and cites only one case in support of its existence anywhere - - <u>Weekoty v. United States</u>, 30 F. Supp.2d 1343 (D.C. N.M. 1998) which, as plaintiff pointed out previously, the Ninth Circuit refused to follow in <u>Agster v. Maricopa County</u>, 422 F.3d 836 (9th Cir. 2005) and which expressly held that there was no peer review privilege under federal law.[1]

Upon learning of these documents, the parties stipulated at Docket 30 that the pending motion for *in camera* inspection could also be treated as a motion to require production of these documents. *In camera* inspection does not appear to be necessary with respect to them, since it is unnecessary to determine whether or not there was any attorney involvement such as is the case with respect to the work product and attorney-client privilege objections as to the IHS documents. In the case of the October 1997

---

[1] As is discussed below, the "peer review privilege" and the asserted "critical self-analysis privilege" are indistinguishable.

Reply Memorandum in Support of
Motion for *In Camera* Inspection     - 2 -

Mortality and Morbidity Conference minutes, the only question is whether the peer review or "critical self-analysis privilege" exists, which does not require examination of the documents themselves.

     2.    <u>Peer Review/Critical self-analysis privilege</u>. The government has apparently abandoned its reliance on the Alaska peer review statute, A.S. 18.23.030, which clearly does not apply here, but rather requests that this court effectively overrule the Ninth Circuit and adopt a "critical self-analysis" privilege for peer review documents such as those in question here. As is noted above, the government relies upon only one case, <u>Weekoty v. Unites States</u>,[2] 30 F. Supp.2d 1343 (D.C. N.M. 1998) for the proposition that while the privilege "has not been fully adopted in this Circuit" it has been "adopted in other jurisdictions in the context of medical malpractice cases." Government's memorandum, p. 13.

In <u>Weekoty</u>, the district court shielded from discovery documents relating to a Morbidity and Mortality Review Committee convened after the plaintiffs' decedent's death while in the care of a United States Health Service physician. 30 F.Supp.2d at 1344. The government had objected based upon the critical self-analysis privilege, which the court held to apply in federal courts in the context of medical peer review documents. 30 F. Supp.2d at 1345. It found that "the self-critical analysis privilege in the medical peer review context" transcended the interest in discovery. 30 F. Supp.2d at 1348. If <u>Weekoty</u> represented the law in the Ninth Circuit, plaintiff would agree with the

---

[2] This case is incorrectly cited in the government's memorandum as <u>Weekoty v. Spectrum Medical Group</u>. See government's memorandum, p. 13, n. 23.

Reply Memorandum in Support of
Motion for *In Camera* Inspection    - 3 -

government that the documents in question are not subject to discovery (unless the "privilege" had been waived). However, as plaintiff pointed out in his initial moving papers, Weekoty has been rejected by the Ninth Circuit.

In Agster v. Maricopa County, 422 F.3d 836 (9th Cir. 2005) the Ninth Circuit considered whether or not documents generated in connection with a Morbidity Review by a health services company whose employees provided health care at a jail were privileged, and held that they were not. The court noted that the government urged it to follow Weekoty v. United States, supra, on essentially the same rationale it asserts here, but the court declined to do so. 422 F.3d at 839. As plaintiff noted in his prior memorandum, the Ninth Circuit's refusal to recognize the privilege applied in Weekoty was based, in part, on the fact that congress had twice had the opportunity to recognize such a privilege when it enacted and subsequently amended the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 1101 *et. seq.* but did not do so, even though it conferred immunity upon participants in medical peer reviews. 425 F.3d at 839.[3]

The government seems to argue that Agster is distinguishable and applies only in the context of health care provided in a prison, on the theory that a hospital's first objective is the welfare of its patients, whereas a prison also has to consider safety and efficiency. Government's memorandum, p. 14. However, this argument flies in the face

---

[3] In view of the Ninth Circuit's express finding that Congress did not grant a peer review privilege in enacting the HCQIA of 1986, it is surprising that the government cites congress' findings underlying that act in support of an argument for the existence of a privilege without noting that a controlling decision in this circuit has expressly rejected that argument. See, government's memorandum, p. 10, n. 14.

Reply Memorandum in Support of
Motion for *In Camera* Inspection      - 4 -

of the Agster decision itself. While recognizing the distinction cited by the government, the court made it clear that its refusal to recognize the peer review privilege was based upon "two considerations, one general and the other particular to this case." The consideration "particular to this case" was the fact that the death occurred in a prison; but the "general consideration" was the fact that congress had twice had the opportunity to, but did not, recognize such a privilege even though it granted immunity to the participants in the peer review process. 422 F.3d at 839. Obviously, the "general consideration" is not limited in its application to medical care provided in a prison, and the court would not have referenced it at all unless it intended that its opinion apply beyond situations in which medical care is provided in a prison.[4]

Another relevant factor is present in this case. The documents in question have already been provided to defense counsel, apparently at the request of the Department of Justice. Although the government has abandoned its reliance on the Alaska peer review privilege statute, A.S. 18.23.030, *et. seq.*, it seeks that this court recognize, in substance, an identical privilege under federal law. Documents protected by a peer review privilege are not only exempted from discovery, but the privilege requires that

> all data and information acquired by a review organization in
> the exercise of its duties and functions shall be held in
> confidence and may not be disclosed to anyone except to the

---

[4] The government's reliance on Union Pacific Railroad Company v. Mower, 219 F.3d 1069 (9th Cir. 2000) and Dowling v. American Hawaii Cruises, Inc., 971 F.2d 423 (1992) in regard to the "self-critical analysis privilege" is misplaced. In those cases, the court considered but did not recognize what it referred to as "this novel privilege". Union Pacific, 219 F.3d at 17, n. 7. In any event, the court's subsequent decision in Agster flatly rejected it in the context of medical peer review documents.

Reply Memorandum in Support of
Motion for *In Camera* Inspection      - 5 -

> extent necessary to carry out the purposes of the review organization and is [sic] not subject to subpoena or discovery.

A.S. 18.23.303(a). Thus, if the documents are subject to a peer review privilege, defense counsel has no more right to see them than does plaintiff's counsel. The purpose of the peer review privilege doctrine is not to give defendants an unfair advantage in a malpractice case, which obviously is going to be the result if the defendant is entitled to see the documents and the plaintiff is not. Accordingly, even if such a privilege exists, which plaintiff believes is clearly not the case, it has been waived here by provision of the documents by ANMC to its counsel for use in defense of this case. This self serving use of the documents to enhance its own litigation position while seeking to deny them to the plaintiff has already corrupted any interest in shielding the peer review process from scrutiny in litigation.

    The whole rationale underlying the argument in favor of a "peer review" or "critical self analysis" privilege is far fetched and contrary to common sense. The theory is that physicians will not be forthcoming or cooperative with the peer review process if their comments can be used in civil litigation, but will be if their comments cannot be so used. The problem with the theory is that other potential adverse consequences - - to the physicians providing the information and to their colleagues - - are far greater than the danger of civil litigation. It stands to reason that if physicians are willing to provide information detrimental to themselves or to colleagues that may reflect adversely on their professional reputations or may subject them to potential loss of employment or hospital privileges, they are not going to be dissuaded from doing so because it may subject some

Reply Memorandum in Support of
Motion for *In Camera* Inspection     - 6 -

entity - - particularly the United States Government - - to monetary liability in tort. Regardless of whether one accepts the rather cynical premise that physicians cannot be trusted to be open and truthful absent an evidentiary shield, it is obvious that such an evidentiary shield is ill adapted to its intended purpose - - to cause the physician to be more forthcoming.

It seems evident on its face that the whole purpose of providing a "peer review" or "critical self analysis" evidentiary shield - - at least in theory - - is to cause the physician to provide testimony or information that he or she would otherwise be unwilling to provide. The government asserts in oxymonic fashion at pp. 9-10 of its memorandum as follows:

> Any information possessed by these percipient witnesses [the participants in the peer review process] was and has been available to [plaintiff] through deposition. The United States does not seek to hide anything here: the United States only seeks to protect the production of this particular document, and to protect the process that led to the creation of the document.

If this assertion is correct - - that plaintiff will not be prejudiced because the participants in the peer review process will give the same testimony at their deposition as they did in the peer review process - - two things are obviously true. First, the rationale asserted to justify the peer review privilege is false - - an evidentiary shield is not necessary to induce the physicians to testify truthfully. Second, whatever is achieved through providing the evidentiary shield will be lost as the result of ordinary discovery. The privilege would therefore serve no purpose.

Reply Memorandum in Support of
Motion for *In Camera* Inspection          - 7 -

3.     <u>Attorney Work Product</u>.    The IHS documents as to which the government asserts attorney work product were prepared "on or about April 26, 2000" according to the government. An affidavit of Richard G. Bergeron states, a p. 3, paragraphs 5 and 6, that Claims Office's paralegal conducts an initial investigation "at the direction of OGC counsel" which often includes obtaining of "peer medical review". At the completion of the examination, the Claim's Office paralegal "then forwards a copy of the administrative file to a CELB Team leader, who assigns the matter to an OGC attorney." Thereafter, according to the affidavit, the assigned OGC attorney evaluates the claim and makes a recommendation.

The affidavit is carefully worded, and does not address the extent of the "direction" that the paralegals get from OGC counsel, and does not state anything specific to this case about who the OGC counsel was, or the nature or extent of his or her involvement during the investigative phase conducted by the paralegals. However, on June 5, 2000, several weeks after the documents in question were generated, the Claims Branch, Dorthea Koehler for Arthur Simon, Claims Officer, wrote counsel for plaintiff stating that "This office has discharged its responsibilities in the investigative phase of your client's claim." The letter goes on to state that the claim "has been forwarded to the Office of the General Counsel (OGC), Department of Health and Human Services for determination." It directs counsel to communicate further with the Litigation Branch, Business and Administrative Law Division, OCC. The "Claims Branch" is located in the Parklawn Building in Rockville, Maryland, while the OGC is located in the Cohen

Building on Independence Avenue in Washington. See Exhibit 1.

It therefore seems questionable whether there is any significant or direct attorney involvement until after the reference of the case from the paralegals to the OGC, which occurred after the documents in question here were generated. As plaintiff pointed out earlier, the law of Alaska is that a file generated by an insurance company's claims division

> shall be conclusively presumed to have been compiled in the ordinary course of business, absent a showing that they were prepared at the request or under the supervision of the insured's attorney. Prior to such attorney involvement, materials held by insurers are subject to discovery without regard to any work product restrictions.

Landgon v. Champion, 752 P.2d 999, 1007 (Alaska 1998). Obviously, insurance companies employ paralegals and lawyers, just as does the Department of Health and Human Services. However, just as in the case of the insurance company, absent a showing that the documents in question were prepared at the request of or under the supervision of an attorney, which plaintiff submits has not been adequately demonstrated here, the IHS documents generated in April 2000 are not subject to a work product privilege.

4.   Conclusion. This court should order that the October 1997 peer review materials be provided immediately, and should conduct an *in camera* review of the April 2000 IHS documents and, absent a showing that they were prepared at the request or direction of an attorney, order that they be provided to plaintiff as well.

Respectfully submitted at Anchorage, Alaska this 12th day of March 2007.

Hedland, Brennan and Heideman
Attorneys for Plaintiff
/s/ John S. Hedland
Anchorage, Alaska 99501
Phone: (907) 279-5528
Fax: (907) 278-0877
E-mail: jhedland@hbhc.alaska.net
ABA No. 6903014

CERTIFICATE OF SERVICE

I certify that on the 12th day of March 2007 a copy of the foregoing was served electronically on:
Daniel R. Cooper, Jr., Assistant U.S. Attorney
s/John S. Hedland